The first case for argument this morning is 16-1346 Regeneron Pharmaceuticals v. Merus. Mr. Katyak. Thank you, Chief Judge Kraus. May it please the Court. The District Court made a series of errors in this case, many of which stemmed from a basic misunderstanding of what the patent had issued, the 018 patent claims. At the time of the patent in 2001, the conventional wisdom was that antibodies produced by mice should be as human as possible and mouse genes were manipulated accordingly. Regeneron had a counterintuitive approach. It realized that when mice were too human, the antibodies that the mice would produce would be fewer and weaker. So instead of pursuing the trend of the more human the better, it sought to produce a mouse that would produce antibodies that were part human and part mouse, and specifically that had a human variable region and a mouse constant one. Those antibodies, of course, wouldn't be directly put into humans. Did your client assert that the claims cover only reverse-tumoric mice? They did. Where in the record is that standing? So starting with the prosecution history, Your Honor, if I turn to A443, the examiner understood these claims to be directed at the mouse. That's, quote, directed to a mouse with an unrearranged chimeric heavy and or light chain locus, and then A385, directed to a mouse with an unrearranged chimeric locus. And here's what we said. At A554, we said during the prosecution, these are not antibodies mounted in a mouse of claim one or a mouse recited in claim one. A454, the mice of the pending claims, A456, similar, A457, and so on. So that's the prosecution. And then I understand Maris has also made the argument that we said something different in claim construction. Our reply brief at page 10 quotes the Markman brief. And if you look at pages two to nine of the Markman brief, it's very clear. Regeneron had a whole section called, quote, Brief Summary of Regeneron's Pioneering Technology. And not once does it refer to LitVec or any other method. Here's the important point, Judge Wallach, about this. The district court found that the patent was about a method, not a mouse. We think that was wrong on claim construction. But we also think if you agree with that, which is what the district court found at page A118 of the broadest reasonable construction, that mandates clear reversal of what the district court did. Because if the broadest reasonable construction is this LitVec method, which is what the district court says at that page, none of these four asserted references have anything to do with the LitVec method. Let's assume we reject that notion. Why don't you tell us about the specific intent question? Great. Right, so there are two prongs. They have to show them both by clear and convincing evidence. We don't think they met but for, on the district court's own reasoning, on specific intent, Chief Judge Prowse. We think the district court got it absolutely wrong here. That is, she canceled the trial altogether on this key element of what is inequitable conduct, which is one of the most grave things for patent prosecutors and for the PTO and, indeed, for a company, as there are since recognized. And here, we weren't even allowed to have a trial at all. The district court's reasoning on this was, well, there was some abuses of attorney-client, the scope of the waiver for attorney-client privilege. And I'm not here to disagree with that at this point. That standard of review is too— So at what point would what your—so you agree that there were some problems in the conduct with respect to discovery and disclosure. It's too hard for us to argue. We do disagree with them, but it's too hard on the standard of review for us to raise those. But what we do think— So if we accept everything she said— Correct. —with regard to that, then your argument is that, therefore, I mean, what she described as, at this juncture of the trial, she would have to have a special master overlooking all of the disclosures and going through all of the disclosures and that, within her discretion, that was not the appropriate way to proceed. Why is that an error? Because under controlling Second Circuit precedent, and the relevant cases are Xin Kong and the Salahuddin case, when you're doing something that is—a district court does something so grave as to dismiss an action altogether on one of two elements, which is exactly what Xin Kong was about. At that point, you have to show bad faith. That's the finding. The district court never, ever made a bad faith finding. And so under Second Circuit precedent, she couldn't go so far as to cancel the trial altogether. She found affirmative egregious misconduct. So affirmative egregious misconduct is back on the first element about but-for materiality, and I definitely want to deal with that. And she also found an intent to deceive the PTO. So on affirmative egregious misconduct, I don't think that she made a finding of deliberate intent to deceive the PTO. And indeed, I think—but even if—and I'll talk about that— Twenty pages. And I'll talk about that in a moment, Judge Walk. But even at most, all that would get is the exception to but-for materiality. It wouldn't deal with Chief Judge Krauss' point about specific intent because these are two separate elements. There are—since it's very clear, you can't kind of mix and match from one to the other. Now here's the problem with what she had to find on affirmative egregious materiality, which is a narrow exception that has to be shown by clear and convincing evidence. The only thing Maris is defending here is these slides in 2013. And I think it's very important to drill down and see what happened with those slides. Those slides were introduced in the context of a PTO proceeding that was always about a debate about obviousness. There was no question whatsoever about enablement in 2001 or 2013. Indeed, the brief, when we attach the slides, the brief that we attach them to, this is at page A457, makes very clear why we're attaching these slides, which is to show unexpected results to defeat any argument about obviousness. So there was no risk when those slides were introduced that there was going to be some sort of misleading of the PTO, particularly not a deliberate one, because enablement was just never at issue, one in one way, shape, or form at any point in the case. And in addition, in 2001, when the patent, the 018 patent was written, as our brief says, it was put in the present tense as a prophetic example. And the sharing case from this court is very clear. When you use present tense, you can use a prophetic example. There's no intent to deceive the PTO. These slides were introduced simply to say exactly what I said at the outset of this argument, which is Regeneron came up with something new and innovative, something counterintuitive. What about her alternative, Rule 37B? Yes. So now back on the specific intent prong. Rule 37 does permit a district court to do that and to dismiss, but you've got to show bad faith. And there's no bad faith finding here. That's the problem. There were, you know, we don't, as I was saying to Chief Judge Press, we don't disagree for purposes of this appeal that there were problems that were made. But to go so far as to say that this was the bad faith of the attorneys and that you could eliminate one of two elements. In the Second Circuit, for a 37B sanction, you have to show willfulness of the noncompliant party. You have to show lesser, the efficacy of lesser sanctions. The duration of noncompliance and whether the willful party has been warned of noncompliance. That's their forefront task. So it does require, and as our brief explains, Shing-Kong, when it's dealing with canceling an element or something like that, you do have to show what you call willfulness but is translated in the Second Circuit as to bad faith. And that was the finding she didn't make. And so she could have done all sorts of other things. We don't disagree that she could have barred these two witnesses, Smealand and Jones, from testifying or perhaps even said that these documents couldn't be introduced or something like that. In that way, you say she could have barred the witnesses. That's under 37B-2, I think, right? Correct. But there's a menu. Sure. So she could have, for example, made findings of fact. She could have made findings of fact and entered a judgment based on those findings of fact. Do you agree with that? We certainly agree that she has the raw power to do that if she makes, if she does the correct steps. And those steps weren't done here, which is to show bad faith. We're not saying that she lacks the raw power altogether. But she's got to do that. And here she had other things available to her. She called this an adverse inference. So this is not like she's talking about something else. She called this an adverse inference. This is way more than adverse, and it's way more than an inference. She canceled the trial altogether on one of the two elements. This court in Theracens has said this is the atomic bomb of patent law. It has such grave consequences, not just to this company and not just to patent prosecutors, who would then have to kind of flood the PTO with all sorts of possibly immaterial evidence or largely irrelevant evidence. But it also has consequences for the system as a whole. And so that's really, I think, the problem. That's why this court in Theracens said specific intent, and the court was unanimous on that. I understand different folks were on different sides. I hate to mix elephants and mice, but you're leaving aside the elephant in the room, and that is that there was a direct misrepresentation about what had been done in relation to these mice. So, again, Judge Wallach, I don't feel that that is accurate. So I think that those slides, and most, even under the so-called smoking gun document that they have, says that the slides were, quote, correct but perhaps could be a little misleading. And to the extent they were misleading, they were misleading on an element, enablement, which was just not at issue in 2001 or 2013. I don't think that gets close to affirmative egregious misconduct, which is the exception to but-for materiality, and it certainly doesn't answer the specific intent question. Well, let's assume we conclude there is but-for materiality with respect to those, what are they, three or four references? Then what's your response to the conduct that occurred or failed to occur between the time that this TPS discloses these references and your client files the fee and the patent application issues? Why wasn't there a requirement of disclosure, and why is there not a circumstantial evidence that there was a specific intent to deceive by their not disclosing those references to the PPS? So two things. One is I would like to get to these four references because I do think that case for but-for materiality is really weak. Well, take it as a given. But then for that, I don't even think Maris is relying on that. I think Maris' brief is really focusing on just the slides now and whether or not those were misleading. And the district court made no finding that this fee or anything like that was deliberate deception of the PTO. And so I don't think that can get you to the specific intent that is required. If I could spend a minute on the but-for materiality in these four references, there are three different ways of understanding the broadest reasonable construction here. One is the district courts, which I was saying to Chief Judge Proust at page A118, which is that it includes mice produced by the Litvec method. None of the four references have anything whatsoever to do with that. If you take her BRC, you've got to reverse the decision. The second is our version of the BRC, which is a reverse chimeric mouse, that is a human variable in mouse constant genes. There is no reference of these four that discloses anything like that. The only way Maris can win is by persuading you that the district court's BRC is wrong and that their BRC is right, which is that the claim, claim one, is only about the targeted insertion of human variable DNA. When you drill down and look at the references, there's only one possible reference that goes to that, that discloses the targeted insertion of human DNA. That is one sentence in Brueggemann, which is speculative. If you look at that one sentence, our brief at pages 38 lays out that sentence and compares it to what we did disclose, Kutcher-Larpati, in opening brief page 39. They're almost exactly the same sentence. The only difference that the district court pointed to was that Kutcher-Larpati, our disclosed source, was not enabled, and she ignored the fact that Brueggemann, on the very page she cites, this is A3917 in the record, says that it's not enabled either. Quote, the ambitions have not been realized. And our fundamental problem on BRC is that the judge read the four asserted references so broadly to encompass so much, but then read what we did disclose, Kutcher-Larpati and Longberg, so narrowly. And what's sauce for the goose is sauce for the gander. If you're going to read these four asserted references really broadly, as the judge did, then I think you've got to read the disclosed references just as broadly. And Longberg and Kutcher-Larpati do disclose everything. And when Ms. Carson comes up, I think a key question will have to be, what did these references disclose that weren't in Kutcher-Larpati or Longberg? And I don't think the district court ever made that fundamental key thing. We think that's the most important point for purposes of this appeal, that specific intent is lacking, and under any version of broadest reasonable construction, we win. We do think that the judge made some other errors on claim construction and indefiniteness. On claim construction, the most important error we think the judge made was that she found it as a method. And again, if you do view it as a method, then I think that kicks out the inequitable conduct finding because there's nothing in these four references about that. But I think it's just wrong on claim construction. We have said all through this, the text of the claim is very clear. The text of the claim discloses a patent on a mouse. It's not a patent on a method. There's no word method in there. And really, that text settles the question. And then the last-ish set of issues is about indefiniteness. And there, Maris' own expert, I think, gave up the store because the Maris' expert said, all you really need to know is the front end, the three-prime part, not the end, the five-part prime. And that's enough to allow someone to know the scope of the invention. You're almost exhausted your rebuttal. So I'm going to sit down and we'll restore two minutes of rebuttal. Good morning, Your Honors. May it please the Court. I think it's important for the Court to recognize that the judgment of non-infringement in this case rests on three separate individual claim constructions. Affirming any one of those claim constructions will result in an affirmance of the finding of non-infringement. Now, the finding of invalidity based on indefiniteness, that stands apart from the three claim constructions, although Mr. Katyal would have a clear voice. Why don't you talk to us about the elephant in the room, which is the inequitable conduct conclusion here. Absolutely. Firstly, why don't you respond to Mr. Katyal's major point, which is that the BRC doesn't support the conclusions here, if you apply the broadest reasonable construction. Your Honor, the District Court specifically found that even under Regeneron's BRC, that the references were but for material. That was a finding of fact that the Court made after hearing testimony, crediting Dr. Davis, our witness, finding Dr. Ottinger, who was Regeneron's witness, to have shifting explanations and to be less credible. So she made a specific finding that even under Regeneron's broadest reasonable construction, the references were but for material. And I would direct the Court's attention to the Wood reference, which absolutely, under the fact findings of the District Court, does disclose what they want to call reverse chimeric antibodies. How are you defining material when you say the references are material? Certainly they're in the same field, but it didn't look as if they were invalidating. They certainly were invalidating. And how do we know that the claims of the 018 patent would not have issued had Regeneron disclosed them? Well, they were submitted in 11 other applications. Now, Regeneron makes the statement in their brief that those 11 other applications had different specifications. That's absolutely false. They did not have different specifications. It's the claims we're looking at, not the specifications. The claims the District Court found were very, very similar. The District Court walked through those, and in every single one of those cases, those references that Regeneron withheld in the 018 were the subject of a rejection. Was there a double patenting? There were also double patenting rejections, which were in the record that was before the District Court. So they'd be resolved by terminal disclaimer, and that would end the problem, would it? I think that Your Honor's putting two concepts together. Well, I'm trying to understand why the points that you're making are inequitable conduct. If you're asking how do we know that the claims were close? We have materiality and intent. We have a history of what this Court has called a plague because it's very hard to find any patent, any specification, any prosecution where you can't retrospectively find something to complain about. And that's not the case here. Here we had four references, and I think that Mr. Katyal is overstating the adverse inference here because under Therosense, in order to demonstrate inequitable conduct, we had to demonstrate that Drs. Smealan and Murphy knew of the references. So how are you defining materiality? The materiality, the way the Court looked at it, was that she knew that those references taught the very element that Regeneron told the Patent Office was missing, and that's insertion at the endogenous mouse locus. That's what they told the Patent Office was missing, and that was what they told the Patent Office was missing for Claims 1 through 5. Now, in their reply brief, they talk about how, well, we were talking about reverse chimeric. They were talking about a different claim, Claim 20, not Claims 1 through 5, because Claims 1 through 5 are not limited to a reverse chimeric antibody. They're just some insertion of human DNA at the endogenous mouse locus. And your honors will look at the record. In the very same response and amendment that Regeneron points to, it's clear that it's Claim 20 that's being discussed about the reverse chimeric, but Claims 1 through 5, which were anticipated over at Lomberg, there they said, what's important here and what's different about us is that we have insertion at the endogenous mouse locus, and that's what every single one of those withheld references taught. So they were but for material, because if you read what the examiner said when she allowed the application, that was what she found was missing in the art, the insertion at the endogenous mouse locus. And with regard to specific intent? With regard to specific intent, as I said, Mr. Katyal is really overstating where the adverse inference went, because we had a trial. They had a trial on materiality. At the same time, we had to demonstrate that Dr. Smealand and Murphy knew of the references, that they made the affirmative decision to withhold the references. So the adverse inference was only drawn to the question of whether at the time that they made that affirmative decision to withhold the references, did they know the references were material? Did they testify as to that action? Your Honor, this was an unusual case. The district court, similar to the way it's done in the ITC, she took the direct testimony in a written form. So it was a written trial declaration that was given. And Drs. Murphy and Dr. Smealand offered their direct testimony, sworn testimony. So at the same time, though, they waived privilege extensively. And so this was just the latest in a litany of misconduct. This was the second time that they had waived privilege. There were multiple motions to compel that involved the first waiver of privilege, and they never produced the documents, and that's in the record. But now the court is faced, on the eve of trial, with all the witnesses there, my clients flown in from the Netherlands, and she's faced with extensive waiver. So she does an in-camera review of the documents that they've now waived privilege on. So the answer to my question is no? I'm sorry. I'm sorry, Your Honor, if I missed your question.  because they put in their direct testimony. And that direct testimony, when the court looked at the documents on Regeneron's privilege log, she found three categories of documents that shouldn't have been there, but the third category were documents that directly contradicted what Dr. Smealand and Dr. Murphy said. This is in the record. So, yes, they offered their testimony, and, yes, she found out that what they were saying was directly contradicted by the documents. She couldn't have allowed them to testify under the circumstances. Why not? Because she would have been allowing them to perjure themselves, basically. They had put in testimony. She doesn't say that. She doesn't call that out, does she? It certainly... I mean, I thought her analysis was that the other side, if this had been disclosed fairly and timely, then the other side has not had an opportunity, one, to review all of the documents, two, to conduct depositions and other extra stuff. I don't think she said, I can't let them testify because they would perjure themselves. I don't know why. I mean, I suppose a Fifth Amendment warning might be appropriate, but I don't know why a district court wouldn't allow someone to testify in order to protect them. I think that it's important, first of all, as I said, the court did conduct an in-camera review, and if there's a concern about whether or not Drs. Smelin and Murphy had the opportunity... It's pretty clear she said she engaged in sanctioning as opposed to protection. She engaged in sanctioning because at that point, and with all due respect to Mr. Katyal, he was not there. I was there. And the court has broad discretion in determining what's an appropriate sanction. Now, this was not the broad sanction that Mr. Katyal says it was, but it was certainly merited under the circumstances. We started with the very beginning of the case, Regeneron refusing to obey the patent local rules and saying rather than breaking their claims down into elements for literal infringement, they said it's all one element. Then for claim construction, they decided to wait and see. Rather than coming out and affirmatively saying what the claim terms meant, they said it's plain meaning. They waived privilege on the eve of the Jones deposition. They're ordered to produce documents. They failed to produce those documents. They withhold a critical conception reduction to practice document and claim it's privileged when it's not. We get through to the eve of trial, and again they waive privilege. And it turns out that not only have they withheld a series of non-privileged documents on their privilege log, they've also withheld a series of documents that were within the scope of the court's earlier waiver order, plus they've withheld all sorts of documents that contradict the sworn testimony of their two witnesses. And under those circumstances, the court was stuck. She was in a place where what to do with this type of information. And it was well within her discretion to draw this adverse influence. Because she concluded what was her only alternative. In the alternative, if she decided to go forward, what would that have been? I think that to have gone forward, as she states in her opinion, would have required her to reopen discovery, to allow documents to then be produced, to order the production of all the waived documents. And under the circumstances, in her discretion, she found that the adverse inference was more appropriate. So here we have four references that you tell us are material. That were not cited in this case. They weren't cited by the examiner. You tell us, and the record shows, that there were a large number of related cases. We've been told that these references were cited. Maybe the wrongdoer was an incompetent examiner who didn't cite references that you tell us are relevant, that were cited in related cases. But the evidence here is that Dr. Smeland was aware of a rejection in a co-pending application. The 018 patent was the issue fee had not yet been paid. This is in the record, that he was aware of the rejection, and he made the affirmative decision not to disclose it, because he was afraid that it would delay issuance. Who knows what the reason, but this is an extraordinarily crowded field of technology. When you look at the list, the search, there are hundreds of references. Wherever you draw the line, there's something to criticize. That's why I asked for your definition of materiality. If it's but for materiality, that's really a different situation than something in the field that's of interest, and yet that distinction doesn't appear. Well, Dr. Smeland knew what the point of distinction over the prior art that was being alleged by, what he was alleging to the patent office, because he was the prosecutor. So he knows that they're saying that what's missing in the prior art is insertion at the endogenous mouse locus, and that's exactly what is taught in all four of these references. So these aren't just a litany of references that may or may not be relevant. These are but for relevant. They're obviously not invalidating references because these claims were not invalidated on those grounds. Well, that wasn't an issue in this court because the patent was invalidated. Well, I kind of understand the materiality. We have a career destroying an extraordinarily serious charge going far beyond loss of the patent or anything else, and we have been looking at this court for standards almost from the beginning because of the extraordinary potential for abuse. You put the lawyers on the defensive, and it's a diversion, and again, I don't think anyone can ever find a case in which the issue can't be raised, and I try to understand the strength of that argument here. So in this situation, the district court found after hearing testimony from Dr. Davis, which she found credible, that these references, had they been disclosed to the patent office... But they were known to the patent office. They'd been cited in related cases. They weren't necessarily known to this examiner, and since this was not a case where we were asserting... We invalidated the patent based on indefiniteness, and the patent is certainly invalid for indefiniteness since there is absolutely no objective boundaries to the endogenous mouse immunoglobulin locus to which the DNA has to be inserted. So we never got to the prior art to then assert these references and invalidate the patent based on those references. But that's significant, is it not? You never got to it. We never got to it because we had already invalidated the patent. However, had we gotten to it, these references would have invalidated at least claims 1 through 5. Do you want us to guess that that would have happened? If this trial judge never got to it, but nonetheless sanctioned? I don't think we have to guess because Regeneron points out that in some of those co-pending applications after they filed their appeal brief that they received notices of allowance. Obviously, that's not in the record, but it's telling that they did not submit the claims that were issued in those cases because if the court... And we would be happy to submit the claims because what the court's going to see is they don't look anything like claims 1 through 5, which those references were but-for material to. They have all sorts of limitations. Do you want us to decide they're material then? The district court's already decided that they're but-for material after listening to six days of testimony. They're material but not invalidating. She determined that they would be invalidating because they're but-for material. But she didn't invalidate on those references? Because that wasn't something that was in the case at the time. As I say, you want us to assume or presume that that's what would have happened? I think that this court should... Because there's no explanation by the district judge. There is no clear error in the district court's finding that these are but-for material references. The evidence in the record below demonstrates that they are but-for material references. You want us to make those findings a fact? The district court's already made the findings a fact that the references are but-for material, and her findings of fact are due deference by this court. My time has expired. My time has expired. Thank you, Your Honor. Thank you. Thank you. There are two elements to the inequitable conduct, and they have a high standard for reasons that Judge Newman was explaining. The consequences are grave to prosecutors, to the PTO, and to the company itself. On that sprung about specific intent, this is not an adverse inference. There's no finding of bad faith by the lawyers here, and this canceled the trial altogether on one of the key elements. On but-for materiality, four points. The first is the most important. I said this in my opening. I said, she's got to come and explain what in those four references she asserts was not already disclosed by the ones we had disclosed, Kutcherler, Potti, and Longberg in particular. She gave you two answers. The first answer, she said, was that Wood taught about reverse chimeric antibodies. So did Longberg. And we were very clear on this. That's, in fact, in the patent itself in the specification. And then all through the PTO, we had disclosed Longberg. Indeed, the whole debate in the PTO was Longberg's already talking about reverse chimeric antibodies. What's new about your invention? Her other point was she said these other references, four of them, I guess, taken together, say teach insertion into the locus. But there's several problems with that. Longberg and Kutcherler-Potti both teach insertion of human DNA into genetically modified mouse. Indeed, Longberg discloses targeting into the mouse using the same technique we are, the homology arms. And that's our brief at page 44. It provides all the citations to this. We gave that to the PTO. There is nothing that is in these references that we hadn't already disclosed to the PTO. It's cumulative. There could be a debate about whether or not our patent was obvious. We understand that. But this is inequitable conduct, that grave thing, not the kind of more modest thing. The second thing, I don't think Ms. Carson explains why these four references just taken on their own terms matter. Our brief explains lots of errors the district court makes with respect to these errors. For example, she called talkie something about human DNA when it's really all about mouse DNA and so on. And then she had said something about claim 20. And our brief only taught claim 20. And our claims weren't drawn to claim one. Our reply brief at page 13 makes very clear that when we talked about reverse chimeric mice, we were talking about claim one. And the citations are there. Thank you. We thank both sides. The case is subpoenaed.